IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **BRYSON MITCHELL, ROBERT RAGANS, TYLER WINTERS, and KIRK HEILMAN,** *Individually and on Behalf of All Similarly Situated Employees* | |
| **Plaintiffs,** | Civil Action No. <u>1:19-cv-2812-AT</u> |
| **vs.** | |
| **NOLAN TRANSPORTATION GROUP, LLC,** | |
| **Defendant.** | Jury Trial Requested |

## COLLECTIVE ACTION COMPLAINT FOR WAGES OWED

BRYSON MITCHELL, ROBERT RAGANS, TYLER WINTERS and KIRK HEILMAN, Plaintiffs, by and through their undersigned counsel and The Law Offices of Peter T. Nicholl, hereby submit their Complaint against NOLAN TRANSPORTATION GROUP, LLC, Defendant, to recover unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Section 16(b) of the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.* (hereinafter, "FLSA"); unpaid wages, liquidated damages interest, reasonable attorneys' fees and costs under the Michigan Workforce Opportunity Wage Act

(hereinafter, "MWOWA") M.C.L.A. § 408.419; and in support thereof, state as follows:

## INTRODUCTION AND BACKGROUND

Nolan Transportation Group, LLC ("Defendant") is a third-party logistics and freight brokerage company that operates nationwide. Defendant's business centers on connecting its clients with independent trucking companies who are able to transport their products. To assist its clients, Defendant staffs its offices with teams of logistics professionals. Each team consists of distinct groups of high-ranking and low-ranking employees.

Defendant's Vice President of Sales, Team Leads and Brokers are the employees at the top of the hierarchy. They are responsible for managing client accounts and making all pertinent decisions regarding Defendant's business. They are also responsible for providing general oversight and supervising Defendant's lower-level employees on each team.

Defendant's lower-level employees hold the titles of Account Manager, Tracking Specialist and Operations Coordinator. They are at the very bottom of Defendant's hierarchy and are primarily responsible for routine clerical tasks. They are the employees on the team charged with performing most of the "grunt" work, which includes data entry and file maintenance.

The employees on Defendant's teams are all paid in the same manner, regardless of whether they are categorized as high-level or low-level employees. Both groups of employees are paid a base salary and some incentive pay.

Plaintiffs were amongst Defendant's low-level employees. They were all employed as Account Managers, Tracking Specialists and Operations Coordinators. Although their tasks were clerical in nature, Defendant refused to pay Plaintiffs and its other lower-level employees overtime wages. Defendant's Account Managers, Tracking Specialists and Operations Coordinators failed to receive "time and a half" their regular rate of pay for all hours worked over forty (40) in a workweek.

Although Defendant refused to pay Plaintiffs and its other lower-level employees overtime wages, they were required to work excessive hours. Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators routinely worked more than fifty (50) hours per week. The nature of their responsibilities left no other choice.

For instance, Defendant's business operates "24/7." "No voicemails" was the mantra at Defendant's offices. Therefore, Defendant staffed its offices in such a manner to ensure that Plaintiffs and other similarly situated employees were available anytime a client called. Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators were the initial points of contact when

3

clients called. Defendant made clear to Plaintiffs and others similarly situated that they had to always be prepared to assist clients in any way necessary.

Persistent understaffing resulted in Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators having to handle an increased number of client calls. This had the effect of increasing their already heavy workload. Their increased workload required them to consistently work an even greater number of hours than normal each week.

Because Defendant refused to pay its lower-level employees overtime wages, Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators failed to receive additional compensation for their extra time worked. Defendant's refusal to pay these employees overtime constituted a willful violation of the FLSA and applicable state wage and hour laws. Hundreds of other employees have been harmed as a result of Defendant's conduct.

## **THE PARTIES**

1.     Plaintiff Bryson Mitchell (hereinafter, "Mitchell") is an adult resident of Fulton County, Georgia.

2.     Plaintiff Robert Ragans (hereinafter, "Ragans") is an adult resident of DeKalb County, Georgia.

3.     Plaintiff Tyler Winters (hereinafter, "Winters") is an adult resident of Davidson County, Tennessee.

4.     Plaintiff Kirk Heilman (hereinafter, "Heilman") is an adult resident of Kent County, Michigan.

5.     Defendant   Nolan   Transportation   Group,   LLC   (hereinafter, "Defendant") is a Delaware limited liability company registered to do business in the State of Georgia.

6.     Defendant's headquarters is in Roswell, Georgia.[1]

7.     Defendant has offices in: Atlanta, Georgia; Charleston, South Carolina; Charlotte, North Carolina; Chicago, Illinois; Dallas, Texas; Denver, Colorado; Detroit, Michigan; Grand Rapids, Michigan; Laredo, Texas; Nashville, Tennessee; and Orlando, Florida.

8.     Defendant's annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

---

[1] Any reference to Defendant shall include its corporate officers and all those empowered to act as agents of the corporation, either explicitly or implicitly, or who are designated as agents under the doctrine of apparent agency. To the extent individual agents are responsible for any actions alleged in this Complaint, they are hereby incorporated by reference within the term "Defendant."

9.    Plaintiffs worked for Defendant who, at all times throughout Plaintiffs' employment, fell within the definition of the term "employer" under the FLSA, 29 U.S.C. § 203(d) and the MWOWA, § 408.419.

10.    At all times relevant to this Complaint, Plaintiffs engaged in interstate commerce based on the duties they performed for Defendant.

11.    Plaintiffs and others similarly situated were employed by Defendant as Account Managers, Tracking Specialists and Operations Coordinators.

12.    Due to the nature of its business and its annual revenues generated, Defendant is subject to the FLSA and the MWOWA.

13.    From approximately January 2018 until October 2018, Plaintiff Mitchell was employed with Defendant as an Operations Coordinator and an Account Manager.

14.    From approximately October 2016 until October 2018, Plaintiff Ragans was employed with Defendant as an Account Manager.

15.    From approximately July 2017 until April 2018, Plaintiff Winters was employed with Defendant as an Account Manager.

16.    From approximately July 2017 to the present, Plaintiff Heilman has been employed with Defendant as an Account Manager, Tracking Specialist and an Operations Coordinator.

17.    Defendant classified Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators as exempt employees.

18.    The duties assigned to Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators did not satisfy the duties tests contained within the exemptions specified in the FLSA or MWOWA.

19.    At all times relevant to this Complaint, Defendant controlled the administration of its business and set employee schedules, including those of Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators.

20.    Defendant's agents were, individually and together, actively engaged in the management and direction of Plaintiffs and other similarly situated employees.

21.    Defendant made all decisions regarding Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators' rates and methods of pay.

22.    Defendant possessed and exercised the authority to determine the hours worked by Plaintiffs and others similarly situated.

23.    Defendant had the authority to control Plaintiffs' tasks and the tasks of other Account Managers, Tracking Specialists and Operations Coordinators.

24.    Defendant retained and exercised the power to change Plaintiffs' and other similarly situated employees' duties.

25.    Plaintiffs and members of the putative class recognized Defendant's authority and obeyed Defendant's instructions.

## JURISDICTION AND VENUE

26.    Original jurisdiction in this Honorable Court is expressly provided by FLSA, 29 U.S.C. § 216(b). This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

27.    Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred within this District and Division. This includes the creation of the compensation policies that gave rise to Plaintiffs' claims for unpaid wages.

28.    This Honorable Court has personal jurisdiction over Defendant; Defendant is incorporated under the laws of Georgia and has its principal place of business in the forum state so as to constitute a submission to its laws.

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

29.    Defendant provides freight brokerage and third-party logistics services to clients across the country. Defendant is primarily engaged in assisting clients with

finding trucking companies that are capable of transporting or delivering its clients' goods.

30.    To facilitate its clients' needs, Defendant staff's logistics professionals at each of its sales offices nationwide. Each office is designed to have a specific number of "teams."[2] Each team has a set hierarchy of lower-level and higher-level employees.

31.    Vice-Presidents of Sales, Brokers and Team Leads are at the top of this hierarchy. They are charged with making all important decisions regarding Defendant's business and for all supervisory and managerial tasks. This includes overseeing and delegating the work performed by Defendant's lower-level employees.

32.    Account Managers, Tracking Specialists and Operations Coordinators are Defendant's lower-level employees. They are all ranked at the bottom tier of Defendant's hierarchy.

33.    From approximately January 2018 until April 2018, Plaintiff Mitchell worked for Defendant as an Operations Coordinator. From April 2018 until October 2018, he worked for Defendant as an Account Manager.

---

[2] Defendant's teams are often configured based on their particular "region." For instance, the Atlanta, Georgia sales office has four (4) teams broken down into four (4) different regions: North, South, East and West.

34.    From approximately October 2016 until October 2018, Plaintiff Ragans worked for Defendant as an Account Manager.

35.    From approximately July 2017 until April 2018, Plaintiff Winters was employed by Defendant and held the title of Account Manager.

36.    From approximately July 2017 until September 2017, Plaintiff Heilman worked for Defendant as an Account Manager. From September 2017 until January 2018, he worked for Defendant as a Tracking Specialist. From January 2018 until the present, Plaintiff Heilman has held the title of Operations Coordinator.

37.    Regardless of their particular title, the employees on Defendant's teams are all classified as exempt. No matter what duties they perform, they are all paid a salary and are not eligible to receive overtime wages.

38.    Regardless of the specific duties attributable to the Account Manager, Tracking Specialist and Operations Coordinator position, they were all responsible for the same type of work. Their work primarily consisted of routine office tasks. Data entry and file maintenance were some of their core tasks. Interacting with prospective and current clients, as well as the drivers designated to transport a client's goods, were other duties they regularly performed.

39.    When on the phone with clients, Plaintiffs and other employees who held the specific title of Account Manager would primarily try and solicit additional

freight brokerage business. This entailed making sales pitches and obtaining quotes for potential freight hauling services.

40.    To perform these tasks, Plaintiffs and other Account Managers had to follow Defendant's strict guidelines, as well as the instructions given by Defendant's Brokers, Team Leads and other high-ranking officials.

41.    It was mandatory that Plaintiffs and other Account Managers use Defendant's database to generate all quotes. There were mandatory trainings specific to this process that Plaintiffs and other Account Managers were required to follow.

42.    For instance, before giving a client a quote, Plaintiffs and other Account Managers would first have to access Defendant's internal database, "Freight Hawk." Plaintiffs would use the database to ascertain the rate that Defendant typically charges to complete a similar freight hauling service. The rate usually conformed with the rate that Defendant charged previously. The rate had to be aligned with the expenses required to complete a particular route.

43.    Plaintiffs and other Account Managers also had to complete "cold calls." There were also specific procedures in regard to the manner in which these calls were completed. These procedures centered on maximizing their use of the internet for purposes of identifying businesses that were potentially in need of Defendant's services.

44.     Once Plaintiffs and other Account Managers identified the relevant businesses, they had to then call each business in order to convince them to use Defendant's services. It was common for Plaintiffs and other Account Managers to have to make dozens of cold calls daily.

45.     Plaintiffs and other Account Managers were also charged with calling existing customers in order to facilitate new business. They were responsible for contacting Defendant's current clients to assist them with placing additional freight orders. They were again required to use the Freight Hawk database in order to generate quotes for each client.

46.     After speaking with both potential and existing clients, Plaintiffs and other Account Managers were required to update the database for purposes of documenting their discussions. They performed this task constantly throughout their workday, which required voluminous amounts of data entry.

47.     Defendant's Operations Coordinators were responsible for similar tasks. Plaintiffs and other Operations Coordinators were primarily charged with contacting representatives from Defendant's network of independent trucking

companies.[3] All of these companies were available for hire in order to complete the delivery or pick-up assignment requested by Defendant's clients.

48.     Plaintiffs and other Operations Coordinators were specifically tasked with booking drivers to run the freight for Defendant's clients. There were specific protocols they had to follow in order to complete this task. They had to first access the Freight Hawk database in order to identify the particular transportation routes that needed drivers. They would then create excel spreadsheets for purposes of recording the routes that needed bookings. They also had to upload the spreadsheets to media sources so that potential drivers could see what routes were available. From there, potential drivers would bid for a particular job.

49.     Once a bid was submitted, Plaintiffs and other Operations Coordinators would assign drivers to a specific job. They would then use the database to determine the rate that Defendant previously charged for completing a similar job. They would then relay this rate to the assigned driver.

50.     This entire process was overseen by Defendant's Brokers, Team Leads, or another manager on the team. Said managers had the final say in regard to all final

_____

[3] Defendant's network consists of over 60,000 freight-hauling companies across the country.

pricing. They had the complete authority to intervene whenever they thought the price quoted by an Operations Manager was too high or too low.

51.     Operations Coordinators were given daily performance goals, which included having to make a certain number of outbound calls each day. They were given weekly goals as well, which centered on having to make a specific number of bookings.

52.     There were also specific sales goals that Operations Coordinators had to hit over the course of a given period. This was specific to the profits generated by Defendant for each booking that Plaintiffs and other Operations Coordinators completed.

53.     It was demanded that Plaintiffs and other Operations Coordinators document all of their daily activities. This included having to track each booking they made and each interaction they had with a client in the Freight Hawk database.

54.     Defendant's Tracking Specialists were primarily responsible for ensuring the timely delivery or pick-up of a client's shipments. This was completed through route monitoring, in which Plaintiffs and other Tracking Specialists had to track a driver's location and relay this information to the client. They served as liaisons between Defendant's clients and drivers, which required them to provide regular updates.

55.    Plaintiffs and other Tracking Specialists were also responsible for providing updates to Defendant's Brokers, Team Leads and other higher-ranking officials. This responsibility also entailed having to update Defendant's database each time they received a tracking notification.

56.    Plaintiffs and other Tracking Specialists, as well as other Account Managers and Operations Coordinators, were required to document all of their daily activities. All of these activities were overseen by Defendant's upper management officials. Team Leads, Brokers and other supervisors were actively involved with monitoring Plaintiffs and other similarly situated employees' duties.

57.    Regardless of the specific duties required of their positions, Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators performed the same primary tasks. Their tasks centered on gathering information regarding a delivery or pick-up assignment and updating Defendant's database with that information. Regardless if they spent most of their time on the phone with Defendant's clients or drivers, or whether their tasks were more aligned with arranging deliveries or pick-ups, as opposed to checking the status of deliveries or pick-ups, their core duties were substantially similar.

58.    Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators performed their duties to the extent required by Defendant.

59.     Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators did not have set schedules. Because Defendant's focus was on production, Plaintiffs and other lower-level employees were told they had to work a minimum of eight (8) hours each day, Monday through Friday.

60.     For the majority of his tenure, Plaintiff Mitchell would arrive to work at around 7:00 a.m. Monday through Friday and not leave work until 7:00 p.m. or later. He regularly worked as many as fifty (50) to sixty (60) hours per week.

61.     Plaintiff Ragans typically arrived to work at 9:00 a.m. Monday through Friday and would usually not leave work until 7:00 p.m. Ragans also frequently worked on weekends, leading him to work as many as fifty (50) to sixty (60) hours each week.

62.     Plaintiff Winters routinely arrived to work at 7:00 a.m. during the week and would not leave work until 5:30 p.m. He consistently worked forty-five (45) to fifty-five (55) hours each week.

63.     Plaintiff Heilman consistently worked from 7:00 a.m. to 6:00 p.m. Monday through Friday. It was routine for Heilman to work as many as fifty (50) to sixty (60) hours per week.

64.    Regardless of the number of hours they worked each week, Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators were only paid their regular salaries and minimal non-discretionary bonuses.

65.    For the duration of his employment, Plaintiff Mitchell's annual salary was approximately forty thousand dollars ($40,000).

66.    Throughout his tenure, Plaintiff Ragans' annual salary was approximately forty-two thousand six hundred dollars ($42,600).

67.    During his employment, Plaintiff Winters' annual salary was approximately thirty-five thousand dollars ($35,000).

68.    Plaintiff Heilman's annual salary is currently thirty-six thousand dollars ($36,000).

69.    Defendant refused to pay Plaintiffs and its other Account Managers, Tracking Specialists and Operations Coordinators overtime wages. They failed to receive "time and a half" their regular rate of pay, which includes all earned non-discretionary bonuses, for all hours worked over forty (40) in a workweek.

70.    Defendant knew that Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators worked overtime regularly.

71.    Defendant suffered and/or permitted Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators to work overtime.

72.    There is no *bona fide* dispute that Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators are owed overtime wages.

73.    Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators were not subject to any overtime exemptions.

74.    In bad faith, Defendant withheld the overtime wages owed to Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators.

75.    Consequently, on behalf of themselves and all those similarly situated, Plaintiffs seek the wages to which they are entitled and other available relief through this Complaint.

## FLSA COLLECTIVE ACTION ALLEGATIONS

76.    Plaintiffs and other similarly situated employees work or worked as Account Managers, Tracking Specialists and Operations Coordinators for Defendant.

77.    The FLSA requires employers to compensate non-exempt employees such as Plaintiffs and others similarly situated with overtime wages for all hours worked over forty (40) within a workweek.

78.    Defendant knew or should have known that Plaintiffs and those similarly situated were entitled to overtime pay for all hours worked over forty (40) in a workweek.

79.    Defendant suffered or permitted Plaintiffs and other Account Managers, Tracking Specialists and Operations Coordinators to work more than forty (40) hours per workweek.

80.    Pursuant to the FLSA, Plaintiffs commence this collective action against Defendant on behalf of themselves and all those similarly situated.

81.    Plaintiffs demand damages reflecting an overtime rate of not less than one and a half (1.5) times their regular rate of pay for all hours worked over forty (40) in any workweek within the statutory period. Plaintiffs make these same demands on behalf of all members of the putative class.

82.    Plaintiffs consent to be party plaintiffs in this matter. Plaintiffs' consent forms are attached to this Complaint as Exhibits A-D.

83.    It is likely that other individuals will join Plaintiffs during the litigation of this matter and file written consents to "opt in" to this collective action.

84.    There are numerous similarly situated current and former employees of Defendant that have been harmed by Defendant's common scheme to underpay its employees and violate the FLSA.

85.    These similarly situated persons are known to Defendant and are readily identifiable through Defendant's records.

86.    Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit.

87.    Upon information and belief, others will choose to join Plaintiffs in this action to recover unpaid wages and seek all other available relief.

## CLASS ACTION ALLEGATIONS UNDER MICHIGAN WAGE LAWS

88.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and other employees, current and former, that served as Account Managers, Tracking Specialists and Operations Coordinators for Defendant and were subject to the following practices and policies: denial of overtime wages under the MWOWA for hours worked over forty (40) in a single workweek.

89.    Plaintiff Heilman is a member of the proposed class he seeks to represent.

90.    The claims alleged by Plaintiff Heilman are typical to the claims of the proposed class.

91.    The potential members of the class are sufficiently numerous, making joinder of all class members impractical.

92.    There are questions of law and fact common to the class that predominate over any questions exclusive to the individual class members.

93.    Counsel for the proposed class are qualified and experienced in litigating class actions and other complex litigation matters.

94.    Counsel is capable of providing adequate representation for all members of the proposed class.

95.    A class action is superior to other available methods for the fair and efficient adjudication of this case and will serve to promote judicial economy to the benefit of this Court, as well as the involved parties.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

### *Count I. Violation of the FLSA: Failure to Pay Overtime Wages*

96.    Plaintiffs are entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

97.    As described above, Plaintiffs have not received from Defendant compensation reflecting the prescribed overtime wage rate for hours worked in

excess of forty (40) in a workweek; Defendant failed to compensate Plaintiffs for these additional hours.

98.    By paying Plaintiffs a salary, Defendant willfully and intentionally failed to compensate Plaintiffs for the overtime hours they worked.

99.    There is no *bona fide* dispute that Plaintiffs are owed overtime wages for the work they performed for Defendant.

100.    Under the FLSA, Plaintiffs are entitled to additional wages from Defendant to compensate them for the additional hours they worked over forty (40) each workweek at a rate of one and one-half (1.5) times their regular hourly wage rate.

### *Count II. Violation of MWOWA: Failure to Pay Overtime Wages*

101.    Pursuant to the Michigan Workforce Opportunity Wage Act, M.C.L.A. § 408.414 each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate.

102.    An employer shall compute the wage for overtime on the basis of each hour over forty (40) that an employee works during one (1) workweek.

103.    Plaintiffs have not received compensation from Defendant reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a workweek.

104. Defendant willfully and intentionally failed to compensate Plaintiffs for the overtime hours they worked.

105. Defendant unlawfully compensated Plaintiffs for these additional hours.

106. There is no *bona fide* dispute that Plaintiffs are owed overtime wages for the work they performed for Defendant.

107. Under MWOWA, Plaintiffs are entitled to additional wages from Defendant for all overtime hours worked at a rate of one and one-half (1.5) times their regular hourly wage rate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and others similarly situated, pray for the following relief:

a) Designation of this action as a collective action on behalf of Plaintiffs and those similarly situated;

b) Designation of this action as a class action on behalf of Plaintiffs and all members of the proposed state class;

c) A finding that Defendant's classification of Plaintiffs and similarly situated employees as exempt was done in error;

d) Judgment against Defendant for its failure to pay Plaintiffs and those similarly situated in accordance with the standards set forth by the FLSA;

e)   Judgment against Defendant for its failure to pay Plaintiffs and those similarly situated in accordance with the standards set forth by MWOWA;

f)   An award against Defendant for the amount of unpaid overtime wages owed, calculated at a rate that is not less than one-and-a-half (1.5) times Plaintiffs' and the putative class' regular hourly rate for all overtime hours worked;

g)   An award of liquidated damages equal to the total amounts of unpaid wages owed to Plaintiffs and those similarly situated;

h)   An award of reasonable attorneys' fees and all costs, plus interest, to be satisfied in   full by Defendant;

i)   Leave to add additional plaintiffs, opt-in or party, through the filing of consent forms; and

j)   All further relief deemed just and equitable by this Honorable Court.

## **REQUEST FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request that a jury of their peers hear and decide all possible claims brought on behalf of Plaintiffs and those similarly situated.

This 19th day of June 2019,

Respectfully submitted,

**DELONG, CALDWELL, BRIDGERS, FITZPATRICK & BENJAMIN, LLC**

3100 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
(404) 979-3150
(404) 979-3170 (f)
benjamin@dcbflegal.com
matthew.herrington@dcbflegal.com

*/s/ Matthew W. Herrington*
Mitchell D. Benjamin
Ga. Bar No. 049888
Matthew W. Herrington
Ga. Bar No. 275411

**THE LAW OFFICES OF PETER T. NICHOLL**

36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
bdavis@nicholllaw.com
mbrown@nicholllaw.com

Benjamin L. Davis, III
(*pro hac vice* admission pending)
Md. Bar No. 29774
Michael A. Brown
(*pro hac vice* admission pending)
Md. Bar No. 20814

**Counsel for Plaintiffs**